LIONEL Z. GLANCY, ESQ.
PETER A. BINKOW, ESQ.
LAW OFFICES OF LIONEL Z. GLANCY
1801 Avenue of the Stars, Suite 308
Los Angeles, California  90067
Phone:    (310) 201-9150
Fax:      (310) 201-9160

WECHSLER HARWOOD HALEBIAN & FEFFER LLP
488 Madison Avenue, 8th Floor
New York, New York  10022
Phone:    (212) 935-7400
Fax:      (212) 753-3630

Attorneys For Plaintiff

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION

------------------------------------x
ARTHUR S. PLEVY, individually, and )
on behalf of all others similarly  )
situated                           )
                                   )
                                   )
              Plaintiff,           )
                                   )
      - against -                  )
                                   )
CHARLES A. HAGGERTY,               )
KATHERYN A. BRAUN,                 )
MARC H. NUSSBAUM, DAVID W. SCHAFER,)
DUSTON M. WILLIAMS and WESTERN     )
DIGITAL CORPORATION,               )
                                   )
              Defendants.          )
------------------------------------X

No. 97- 9200 SVW (SHx)

CLASS ACTION

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff Demands a
Trial by Jury

          Plaintiff, by his attorneys, for his class action

complaint, alleges upon personal knowledge as to himself and

his own acts, and, as to all other matters, upon information

and belief based upon, inter alia, the investigation made by

and through his attorneys, which included, inter alia,

reviewing Securities and Exchange Commission ("SEC") filings,

press releases, published reports and news articles, and other

matters of public record.  Plaintiff believes that further

2:06:29 PM
12/12/97   RDEJESUS   Receipt # 182464
LA   1-1   NO REFUND WITHOUT RECEIPT====
====
CASE #97-9200
086900   Filing Fee Civil   60.00
510000   Special Fund F/F   90.00
====TOTAL====   150.00
                          $150.00
CHECK TENDERED $
====NO REFUND WITHOUT RECEIPT====

1  substantial evidentiary support will exist for the allegations

2  set forth below after a reasonable opportunity for discovery.

3

4                    **NATURE OF THE ACTION**

5        1.   This is a class action on behalf of all persons

6  (the "Class") who purchased the securities of Western Digital

7  Corporation ("WDC" or the "Company") between December 28, 1996,

8  and December 2, 1997, inclusive (the "Class Period"), seeking to

9  pursue remedies under the Securities Exchange Act of 1934 (the

10 "Exchange Act") and common law.

11                  **JURISDICTION AND VENUE**

12       2.   The claims asserted herein arise under or pursuant

13 to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C.

14 §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by

15 the Securities and Exchange Commission ("SEC") (17 C.F.R.

16 § 240.10b-5).

17       3.   This Court has jurisdiction over the subject

18 matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and

19 Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20       4.   Venue is proper in this District pursuant to

21 Section 27 of the Exchange Act.  WDC maintains its corporate

22 headquarters and principal place of business in this District at

23 8105 Irvine Center Drive, Irvine, California 92718 and the acts

24 charged herein, including the preparation and dissemination of

25 materially false and misleading information, occurred in

26 substantial part in this District.

27       5.   In connection with the acts alleged in this

28 complaint, defendants, directly or indirectly, used the means and

instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.    Plaintiff, Arthur S. Plevy, as set forth in the accompanying certification, purchased 8,200 (adjusted for stock split of May 2, 1997) shares of WDC common stock during the Class Period at artificially inflated prices, and suffered damages thereby.

7.    Defendant WDC is a Delaware corporation.    WDC designs, develops, manufactures and markets hard drives for use in computer systems ranging from notebook and desktop personal computers to high performance workstations, LAN severs and multi-user ("enterprise") systems. The Company is one of the top three independent manufacturers of hard drives, the other two being Seagate Technology, Inc. ("Seagate") and Qauntum Corporation ("Quantum").    At October 24, 1997, the Company had 87,289,174 shares of common stock outstanding, which shares are listed and trade on the New York Stock Exchange (the "NYSE").

8.    a.    The individual defendants below, at all times relevant to this action, served in the capacities listed below and received substantial compensation:

| Name | Position |
| --- | --- |
| Charles A. Haggerty | Chairman of the Board President and CEO |
| Katheryn A. Braun | President and Chief Operating Officer, Personal Storage Division |

3

| | | |
|---|---|---|
| Marc H. Nussbaum | | Senior Vice President, Engineering, Personal Storage Division |
| David W. Schafer | | Senior Vice President, Worldwide Sales |
| Duston M. Williams | | Senior Vice President, Finance, Chief Financial Officer |

b.    Because of the individual defendants' positions with the Company, they had access to the adverse, undisclosed information about its business, operations, production cycles, finances, technologies, markets and present and future business prospects through access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and through reports and other information provided to them in connection therewith.

9.    It is appropriate to treat the individual defendants as a group for pleading purposes and to presume that the false and misleading information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.    Each of the above officers or directors of WDC, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest level and was privy to confidential proprietary information concerning the Company and its business, products, operations, technologies, production cycles and business

prospects as alleged herein. ' The individual defendants were involved or participated in drafting, producing, reviewing and/or disseminating the false and misleading statements alleged herein and were aware that these false and misleading statements were being issued regarding the Company and approved or ratified these statements, in violation of the Federal securities laws.

10.   As officers, directors and/or controlling persons of a Company the common stock of which is registered with the SEC, traded on the NYSE, and governed by the provisions of the Federal securities law, the individual defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's business, products, operations, technologies, production cycles and future business prospects, to correct previously issued statements that had become materially misleading or untrue, and to disclose any trends that would materially affect earnings and the present and future operating results of WDC, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. Under rules and regulations promulgated by the SEC under the Exchange Act, specifically Item 303 of Regulation S-K, the individual defendants also had a duty to report all trends, demands or uncertainties that were reasonably likely to impact:   (i) WDC's liquidity; (ii) WDC's net sales, revenue and/or income; and/or (iii) previously reported financial information such that it would not be indicative of future operating results.   The individual defendants' representations during the Class Period violated these specific requirements and obligations.

11. The individual defendants participated in or approved of the drafting and/or preparation of the various public and shareholder and investor reports and other communications complained of herein and were aware of or recklessly disregarded the misstatements contained therein and omissions therefrom, and were aware of their materially misleading nature.

12. The individual defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the contents of the various quarterly and annual financial reports, press releases and presentations to securities analysts pertaining to the Company. Each individual defendant was provided with copies of WDC's shareholder and investor reports, press releases and other disseminations alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. As a result, each of the individual defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

13. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of WDC stock, by disseminating materially false and misleading statements and/or concealing material, adverse facts. The scheme: (i) deceived the investing public regarding WDC's business, technologies, operations, performance and performance trends and the intrinsic value of WDC's shares; and (ii) caused plaintiffs and other members of the

Class to purchase WDC securities at artificially inflated prices.

### INSIDER SALES DURING THE CLASS PERIOD

14.  As reflected in the table below, the individual defendants as well as other WDC insiders engaged in massive insider selling during the Class Period, disposing of virtually all of their personal holdings and/or exercisable options of WDC common stock at enormous premiums over what the stock was actually worth absent the individual defendants' material misstatements and omissions discussed herein that served to artificially inflate the price of the Company's stock.

### Table of Insider Selling

| Insider | Date | Number of Shares* | Price per Share** | Proceeds |
|---------|------|-------------------|-------------------|----------|
| C. Haggerty | 5/30/97 | 71,530 | 27.0625 | N/A*** |
| J. Abrahamson | 1/23/97 | 6,000 | 35.57 | $213,420 |
| | 6/16/97 | 3,000 | 30.38 | 91,140 |
| | 8/11/97 | 2,000 | 49.25 | 98,500 |
| | 8/19/97 | 1,900 | 51.31 | 97,489 |
| | 8/19/97 | 100 | 51.38 | 5,138 |
| I. Federman | 5/16/97 | 2,000 | 33.19 | 66,380 |
| | 8/11/97 | 2,500 | 49.63 | 124,075 |

| | | | | |
|---|---|---|---|---|
| | 8/11/97 | 2,000 | 49.25 | 98,500 |
| | 8/22/97 | 4,500 | 51.00 | 229,500 |
| A. Krueger | 1/22/97 | 14,000 | 34.82 | 487,480 |
| | 1/22/97 | 4,000 | 34.88 | 139,520 |
| T. Pardun | 8/07/97 | 7,500 | 46.75 | 350,625 |
| | 8/08/97 | 5,000 | 48.06 | 240,300 |
| K. Braun | 1/16/97 | 8,310 | 35.07 | 291,432 |
| | 1/16/97 | 10,876 | 35.07 | 381,421 |
| | 1/16/97 | 914 | 35.07 | 32,054 |
| | 1/16/97 | 10,000 | 35.00 | 350,000 |
| | 1/16/97 | 750 | 35.00 | 26,250 |
| M. Nussbaum | 1/15/97 | 14,000 | 36.94 | 517,160 |
| D. Schafer | 1/23/97 | 20,992 | 35.50 | 745,216 |
| | 1/23/97 | 38,108 | 35.50 | 1,352,834 |
| D. Williams | 2/20/97 | 874 | 38.32 | 33,492 |
| | 2/20/97 | 2,188 | 38.32 | 83,844 |
| | 2/20/97 | 938 | 38.32 | 35,944 |
| | 2/21/97 | 9,000 | 36.19 | 325,710 |
| M. Cornelius | 8/06/97 | 3,500 | 45.88 | 160,580 |

| | | | | |
|---|---|---|---|---|
| | 8/04/97 | 2,816 | 40.13 | 113,006 |
| | 8/04/97 | 4,062 | 40.00 | 162,480 |
| | 7/16/97 | 3,471 | 41.00 | 142,311 |
| | 2/20/97 | 3,000 | 37.94 | 113,820 |
| | 2/19/97 | 1,716 | 38.44 | 65,963 |
| | 2/19/97 | 2,332 | 38.44 | 89,642 |
| S. Slavin | 7/24/97 | 3,502 | 38.56 | 135,038 |
| | 7/21/97 | 800 | 38.94 | 31,152 |
| | 7/18/97 | 3,562 | 38.88 | 138,491 |
| | 1/30/97 | 4,200 | 35.94 | 150,948 |
| A. Horn | 1/15/97 | 14,000 | 36.94 | 513,660 |
| S. Hughes | 1/15/97 | 10,000 | 37.32 | 373,150 |
| | 1/15/97 | 10,562 | 37.44 | 395,441 |
| M. Booth | 12/31/96 | 4,200 | | N/A*** |
| **TOTALS:** | | 314,703 | | $9,003,106 |

*Share numbers adjusted for 2 for 1 stock split on May 2, 1997
**Share prices adjusted for stock split
***Designated as a "gift"

9

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.   This action is brought by plaintiff as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

16.   Plaintiff seeks relief on behalf of himself and all other persons who purchased WDC common stock between January 1, 1997 and December 2, 1997.   Excluded from the Class are the defendants herein, members of the immediate family of each of the individual defendants, and affiliates, successors and assigns of the defendants.

17.   The members of the Class are so numerous that joinder of all members is impracticable.   While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, there are over eighty-seven million shares of WDC common stock outstanding held by thousands of shareholders.   WDC's common stock was actively traded on the NYSE, an open and efficient market, during the Class Period.   Further, Class members are believed to be geographically dispersed throughout the United States.

18.   Plaintiff will fairly and adequately protect the interests of the members of the Class and his claims are typical of the claims of all class members.   Plaintiff has retained competent counsel experienced in class action securities litigation.   Plaintiff has no interests that are adverse or antagonistic to those of the Class.   Plaintiff's interest is to obtain relief for himself and for the Class for the harms arising out of the violations of law set forth herein.

19.   Notice to the Class can be provided to such record

owners by first class mail and or publication using techniques
and a form of notice similar to those customarily used in class
action litigation arising under the Federal securities laws.

20.   There are common questions of law and fact arising
in this action, including, *inter alia* whether:

a.   defendants violated the Federal securities
laws by making materially misleading misstatements and omissions
in public filings, press releases and other publicly disseminated
documents during the Class Period;

b.   defendants' statements during the Class
Period concerning WDC's business and financial prospects were
fraudulent and contained material misstatements and omissions
resulting in a fraud on the market for WDC securities; and

c.   defendants, by their wrongful conduct,
created a fraud on the market for WDC securities, and caused
plaintiffs and the Class to suffer damages.

21.   The questions of fact and law that are common to
the Class herein predominate over any questions solely affecting
individual members.

22.   A class action is superior to other available
methods for the fair and efficient adjudication of the
controversy.   It would be impracticable and undesirable for each
of the members of the Class who has suffered harm to bring a
separate action.   In addition, the bringing of such actions would
put a substantial and unnecessary burden on the courts, while a
single class action can determine the rights of all class members
with judicial economy.

## FRAUD-ON-THE-MARKET ALLEGATIONS

23.   With regard to his allegations arising under Section 10(b) and Rule 10b-5, plaintiff intends to rely on the fraud-on-the-market doctrine, which assumes the existence of an efficient market for WDC securities.   In that connection, brokers nationwide have immediate access to press releases and trading information about WDC through computer and news wire systems. These systems display, within minutes of the release or transaction taking place, pertinent information and the most recent trades and prices.   Among the securities firms that followed the Company during the Class Period are PaineWebber Incorporated and Bear Stearns & Co., Inc.

24.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

    a.   defendants made public misstatements or failed to disclose facts during the Class Period;

    b.   the omissions and misstatements of fact were material;

    c.   WDC met the requirements for listing, and was listed on the NYSE, a highly efficient and automated market;

    d.   as a public company, WDC filed periodic public reports with the SEC;

    e.   WDC's trading volume, during the Class Period, was substantial, thereby reflecting

numerous trades each day;

f.   the misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of WDC's common stock;

g.   plaintiff and the members of the Class purchased their common stock during the Class Period without knowledge of the omitted or misrepresented facts; and

h.   WDC was followed by various analysts employed by major brokerage firms (see infra) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and which were available to the public through various automated data retrieval services.   Thus, each of these reports was publicly available and entered the public marketplace.

25.   Based upon the foregoing, plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market for their Section 10(b) claims.

### WDC'S GUIDANCE TO, COURTING OF, AND INTERACTION WITH SECURITIES ANALYSTS

26.   Analysts employed by securities firms prepare written reports and make recommendations from time to time about companies such as WDC.   In writing their reports, these analysts rely in substantial part upon information provided by, and statements and reports made by the Company, and assurances by the

13

1   Company, that the important information in the reports was not at

2   material variance from the Company's internal knowledge of its

3   operations and prospects.

4          27.   WDC is widely followed by numerous securities

5   analysts employed by major brokerage houses which issued reports

6   and made recommendations concerning WDC common stock to their

7   clients.   Reports were issued by these firms just prior to and

8   during the Class Period.

9          28.   Prior to and during the Class Period, it was WDC's

10  practice to communicate regularly with securities analysts at

11  these firms to discuss, among other things, the Company's

12  prospects, products, operating results, and anticipated revenues,

13  and to provide "guidance" to these analysts with respect to WDC's

14  business and projected revenues and earnings.   These

15  communications included, but were not limited to, frequent

16  conference calls, meetings, and analyst briefings, where

17  defendants discussed many aspects of WDC's operations and

18  financial prospects.   During meetings and telephonic

19  communications with analysts, defendants provided analysts with

20  information and presentations, which often included "optimistic"

21  comments about WDC's performance during the year and the future,

22  and a financial outlook for the following quarter and year.

23  Defendants knew that by participating in these regular, periodic

24  communications with analysts, the investment community, and in

25  turn, investors, would rely and act upon these communications,

26  i.e., make purchases and sales of WDC's securities based on

27  communications contained in written reports and recommendations

28  regarding WDC's common stock.   Defendants used these

1   communications to present falsely the prospects of WDC and to

2   artificially inflate the market for WDC common stock, as alleged

3   herein.

4       29.   The information about WDC contained in the various

5   securities analysts' reports was obtained from or based on

6   information obtained from WDC, as discussed above.   As is the

7   standard practice in drafting reports such as these, copies or

8   drafts of these reports would be provided to WDC and its top

9   officers before or contemporaneously with their release,   and

10  those drafts were reviewed by them.   Thus, defendants knew of

11  these reports, their contents, that they were based on

12  information provided by WDC and/or the individual defendants, and

13  that they would be issued to members of the investing public, be

14  circulated throughout the investment community, and impact the

15  trading price of WDC common stock.

16      30.   Consistent with the standard and general practice

17  of the financial community concerning the dissemination of

18  corporate information through financial firms, and in particular,

19  consistent with WDC's practices, WDC adopted, expressly and/or

20  impliedly placed its imprimatur on, and/or acquiesced in,

21  projections, estimates, statements, and reports disseminated by

22  these analysts and concealed, by silence, the extent of the

23  problems of which defendants were aware, but did not disclose.

24      31.   The investment community, and in turn, investors,

25  relied and acted upon the information communicated, both orally

26  and in written reports, recommending that investors purchase WDC

27  common stock.   Defendants manipulated the market for WDC stock by

28  falsely presenting to analysts,   through regular meetings and

15

during both telephonic and written communications, the prospects of the Company and by failing to disclose material adverse information that artificially inflated the price of the Company's common stock as alleged herein.

## NO SAFE HARBOR

32.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of WDC who knew that those statements were false when

16

1     made.

2

3                 **BACKGROUND TO THE MATERIALLY**
              **FALSE AND MISLEADING STATEMENTS**

4         33. During the Class Period, WDC was experiencing

5    material undisclosed problems that caused (a) its public

6    projections for sales and profits for the Company's disk drives

7    to lack a reasonable basis, (b) its financial statements and

8    other public reports of fiancial results to be materially false

9    and misleading, and (c) decreased production levels, eroding

10    margins, and weakening profits and sales. Defendants sought to

11    conceal these problems as they began to impact negatively on the

12    Company's financial results.

13         34. The hard drive industry in which the Company

14    competes is characterized by aggressive competition. WDC is the

15    third largest drive producer worldwide, following Quantum and

16    Seagate. The three firms control about 65% of the market for disk

17    drives, which store programs and other data for mobile, desktop

18    and other computers.

19         35. The hard drive industry is subject to a number of

20    competitive pressures which significantly effect the operating

21    results of those firms that compete in the industry. One of the

22    foremost such competitive pressures is the need to constantly

23    research and develop new and better performing disk drives so as

24    to avoid obsolescence, a fact acknowledged by WDC in its

25    September 28, 1996 Form 10-Q filed with the SEC on November 12,

26    1996:

27          The demand of hard drive customers for
          greater storage capacity and higher
28          performance has led to short product life

1   cycles that require the Company to
    constantly develop and introduce new drive
2   products such the enterprise storage
    products on a cost effective and timely
3   basis . . . The Company's future is
    therefore dependent upon its ability to
4   develop new products, to qualify these new
    products with its customers, to successfully
5   introduce these products to the market on a
    timely basis, and to commence volume
6   production to meet customer demand.
    (Emphasis added.)

7       36. In the Company's December 28, 1996 Form 10-Q,

8   defendants further acknowledged the need to stay on the cutting

9   edge of manufacturing technology in order to remain competitive:

10          All of the Company's hard-drive products
            currently utilize conventional thin or
11          metal-in-gap ("MIG") inductive head
            technologies. The Company believes that MR
12          heads, which enable higher capacity per disk
            than conventional thin film or MIG inductive
13          heads, will eventually replace thin film and
            MIG inductive heads as the leading recording
14          technology. Several of the Company's major
            competitors incorporate MR head technology
15          into some of their current products and with
            higher capacity drives using MR heads, the
16          Company's competitors have achieved time-to-
            market leadership. Failure of the Company to
17          successfully manufacture and market products
            incorporating MR head technology in a timely
18          manner and/or in sufficient volume could
            have a material adverse effect on the
19          Company's business and results of
            operations. (Emphasis added.)
20

21      37. As discussed below, unbeknownst to the investment

22  community, the Company had not upgraded its disk drive products

23  in a "timely manner" to meet competition and had no reasonable

24  prospects of doing so, and instead was essentially dumping

25  obsolete inventory into the market, a situation that was masked

26  by defendants' glowing reports and upbeat projections, their

27  failure to follow generally accepted accounting practices that

28  required write-downs or write-offs of obsolete inventory, and by

                                18

defendants' issuance of materially false and misleading public statements that attributed the Company's failure to meet earnings projections to transient price wars with competitors. In fact, within days of causing the Company to issue the aforementioned December 28, 1996 Form 10-Q, the individual defendants began frantically disposing of their personal holdings of WDC stock in an attempt to personally profit before the truth became known to the investing public.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD

38. Throughout the Class Period, the individual defendants painted a rosy picture of continued sequential earnings growth, even while they knew or were reckless in not knowing that the Company's products and inventory were largely outdated and overvalued and should have been written down or written off, as evidenced, <u>inter alia</u>, by the individual defendants disposing of virtually all of their personal holdings of WDC stock and/or exercisable stock options while they were busy assuring investors that all was well. When the Company's earnings began to be negatively impacted by the obsolete inventory, the individual defendants undertook to mask and minimize the situation by mischaracterizing the disappointing results as being due to transient "price wars" and other passing industry anomalies.

39. In the Company's December 28, 1996 Form 10-Q, the Company attributed its sequential growth in earnings and its "increased market share" to the acumen of defendants in "capitalizing on some missteps made by [the Company's]

competitors." Defendants failed to disclose that the bubble was about to burst and that the outlook for the Company's operations and earnings was dire owing to the obsolescence of the Company's product line and inventory, a fact obviously recognized by defendants (but not disclosed by them) when days later they began dumping virtually all of their personal holdings of WDC stock into the market at artificially inflated prices of their own creation.

40. On January 13, 1997, WDC reported record earnings for the 1997 fiscal second quarter. Net income was purportedly up 75% to $64.2 million or $1.35 per share up from $36.4 million or $0.75 per share for the prior comparable quarter. Defendant Haggerty attributed the "finest performance in company history" to:

> the inherent advantages of the [WDC] business model and our consistent execution to that model . . . Record unit shipments in our desktop business, a stable industry pricing environment, and the ramping of our new Enterprise storage business resulted in sequential improvements in the Company's gross profit margin to 14.6 percent from 12.8 percent in the September quarter . . . We continue to purchase our stock during the quarter, buying approximately three-quarters of a million shares at an average price of $53. (Emphasis added.)

41. On April 10, 1997, WDC announced its third 1997 fiscal quarter results. WDC again announced record earnings. WDC reported total third quarter earnings of $82.6 million, or $1.76 per share, up more than 300 percent over net income of the 1996 comparable quarter. Defendant Haggerty stated:

> Customers' demand for a richer mix of high-performance WD Caviar desktop drives and a solidly profitable performance by our new

enterprise storage business drove <u>record profitability in the third quarter</u> . . . After seeding our enterprise startup with the <u>sustained success of our desktop business</u> for the last 28 months, we have begun to achieve the benefits of a more balanced model. Similar to the last several quarters, we saw <u>sequential increases in a number of P&L measurements, including gross profit, operating profit, and net profit percentages</u>. . . <u>The Company continued its buyback program in the third quarter, acquiring approximately 850,000 shares for $51.0 million</u>. (Emphasis added.)

42. On May 2, 1997, the Company announced a 2 for 1 stock split, to be effected in the form of a stock dividend to shareholders of record on May 20, 1997.

43. On May 9, 1997, defendants caused the Company to file a Form 10-Q with the SEC reporting the third fiscal quarter 1997 results of operations. Therein, the Company reported that, "The incremental unit volume shipped during the first nine months of 1997 was partially offset by a year-over-year decline in the average selling prices of hard drive products. The decline in revenues from the immediately preceding quarter is primarily the result of a 3% decrease in hard drive unit shipments . . ." However, the Company countered this apparent negative with an explanation that the shortage was caused by lack of supply of materials necessary to manufacture the hard drives. The Form 10-Q was signed by defendant Williams.

44. On July 16, 1997 WDC released its earnings for the fiscal fourth quarter of 1997 and the fiscal year end results. The headline was entitled, "Western Digital Reports Record Profits for Fourth Quarter; Year-end Results Establish New Company Standards in Profits, Revenue, Return on Invested

Capital, Assets."  Defendant Haggerty stated,

> The fourth quarter represents the 15th consecutive quarter of solid profitability for Western Digital and <u>reflects continued strength and market share gains in our desktop drive business</u> . . . <u>Western Digital continued its share buyback program with purchases of 1.2 million WDC shares in the quarter for approximately $35 million at an average price of $28.85.</u> The Company has now repurchased 22.2 million shares for a total of $278 million . . . This amounts to approximately 22% of its outstanding shares at the inception of the program in February 1995. (Emphasis added.)

45. On August 10, 1997, The Orange County Register reported that since January 1, 1997, WDC "has seen its stock soar a heady 72 percent, as earnings gains consistently topped Wall Street's estimates."  Commenting on short selling of WDC stock, defendant Haggerty stated:

> I say, fine, let them short the stock and let them have to cover, . . . One of my favorite joys in life is squeezing the shorts - that is, watching the short sellers lose money when a stock goes up and they have to replace borrowed shares at a higher price.

This same article quoted defendant Haggerty as stating: "Western Digital should continue its steady advancement because it has been profitable, manages its costs well and is carrying no long-term debt on its books."

46. On September 12, 1997, defendants caused the Company to file its annual report for the fiscal year ended June 28, 1997 on Form 10-K with the SEC, wherein it was stated:

> <u>The majority of the Company's hard drive products currently utilize conventional thin film or metal in the gap ("MIG") inductive head technologies</u>. The Company believes that magneto-resistive ("MR") heads, which enable

22

1    higher replacement capacity per hard drive
     than conventional thin film or MIG inductive
2    heads, have replaced thin film and MIG
     inductive heads as the leading recording
3    head technologies. <u>Several of the Company's
     major competitors have incorporated MR head
4    technology into some of their current
     products, and with higher capacity drives
5    using MR heads, the Company's competitors
     have achieved time-to-market leadership.</u>
6    The Company is already shipping mobile
     products with MR head technology and <u>expects
7    to ship desktop product[s] with MR head
     technology that will achieve time-to-market
8    areal density leadership in early 1998.</u>
     (Emphasis added.)

9

10   The Form 10-K was signed by, <u>inter alia</u>, defendant Haggerty.

11

12        47. On September 29, 1997, WDC announced that profits

13   for the 1998 fiscal first quarter would be below expectations.

     To ease the investment community's concerns and to stem the fall
14
     of WDC's stock price in reaction to the news, defendants publicly
15
     attributed the anticipated short fall to pricing pressures from
16
     one of the Company's competitors and assured the market that the
17
     Company would achieve "solid sequential growth in unit shipments,
18
     revenue and profitability" in future quarters by temporarily
19
     decreasing production rather than engaging in a price war:
20

21        [h]ard drive pricing significantly weakened
          in the quarter as a major competitor
22        liquidated excess inventory in the
          distribution channel." Defendant Haggerty
23        continued, "We will not seek market share
          gains at the cost of ruinous price
24        competition, hence our decision to reduce
          production . . . Although the pricing
25        pressures which affected gross margins in
          the first quarter and will also impact
26        subsequent quarters, current OEM customer
          forecasts for the seasonally strong December
27        quarter indicate <u>solid sequential growth in
          unit shipments, revenue and profitability
28        for Western Digital</u>, abeit at lower levels

                              23

than previously planned.  (Emphasis added.)

48. On October 9, 1997, WDC reported its first quarter results for fiscal year 1998, which, as the Company had predicted, were lower than expectations.  Defendant Haggerty, again deflecting the fault for WDC's earnings shortfall to "industry" adjustments, predicted bright times ahead for WDC and other disk drive manufacturers:

> Since announcing last week that we were adjusting our December quarter production plan to address the drive industry's excess inventories, we have noted reports of several other industry participants making adjustments to their plans as well . . . These are _positive signs_ for the industry and an indication of its maturation as a major global business.  (Emphasis added.)

Haggerty continued, "We are looking at a strong demand for the December quarter from the major PC and server manufacturers . . . Our new [MR drivers] are going to be in the right place at the right time based upon customer demand."  Following the issuance of this press release, the price of WDC stock rose $2.13 a share, closing at $40.38 a share in after-hours trading.

49. On November 7, 1997, WDC announced that its earnings for the second fiscal year 1998 quarter would be below analysts' expectations as well. Forced to acknowledge at least part of what they had known since at least the end of 1996, but still desiring to perpetuate the charade that the Company's problems were primarily the result of price cutting by competitors, defendants caused the Company to issue a press release that grossly minimized the magnitude of the Company's obsolete inventory problem and its negative effect on the

Company's earnings and prospects:

> product mix and cost problems associated with the Company's last desk top drives based on thin-film technology also will hurt results in the period . . . Additionally, [WDC] is considering taking charges totaling $15 million to $30 million on the phase-out of thin-film head products in favor of hard drives with newer magneto-resitive [MR] heads . . .

50. Also on November 7, 1997, the defendants caused WDC to report its first fiscal 1998 results of operations on Form 10-Q and filed such with the SEC, which again attributed the decrease in the Company's earnings to transient price competition and downplayed the problems associated with the Company's obsolete technology and inventory:

> The decrease in gross profit margin from the immediately preceding quarter was <u>primarily due to greater price competition in the current quarter</u>, particularly with the Company's low-capacity desktop storage products. Also, <u>the gross profit margin was somewhat impacted by higher manufacturing costs associated with extending the life of thin film head technology in desktop products</u>.   (Emphasis added.)

51. Defendants then immediately engaged in a public relations campaign to deflect attention away from the true problem and convince the investment community that the Company's poor results were a temporary phenomenon attributable to aggressive price cutting by competitors. For example, on November 8, 1997, The Orange County Register quoted defendant Haggerty as stating, "We're already seeing pricing that's down by double digits . . . .Some of the pricing out there may lead you to believe (that Fujitsu is) pricing at cost."

25

1    52. Each of the statements set out above were
2    materially false and misleading in that defendants failed to
3    disclose the truth about the Company's bleak prospects and the
4    true reason for the shortfall in earnings, which was the
5    obsolescence of the Company's products and inventory, and instead
6    forecasted continued "solid" growth in revenue and profitability
7    without any reasonable basis for doing so in light of the
8    Company's obsolete inventories and lack of competitive products.
9    Defendants further misled the investment community by engaging in
10   the fraudulent scheme and/or practice of regularly touting the
11   Company's repurchase of a substantial volume of WDC shares, which
12   was designed to and did create the false impression of corporate
13   health and prosperity and which further served to artificially
14   inflate the price of WDC stock, even as the individual defendants
15   were busy disposing of their personal holdings of WDC stock.

16
17   **THE TRUTH IS REVEALED**

18   53. On December 2, 1997, WDC stunned the investment
19   community with the announcement that the Company planned to take
20   a charge against earnings of between $85 million and $95 million
21   for the second quarter for fiscal year 1998, and that contrary to
22   the rosy picture painted by defendants, operating results before
23   the planned charges would be only "break-even" for the second
24   quarter and only "modestly profitable" for the full fiscal year.
25   As reported on the December 2, 1997 Dow Jones News Wire:

26
27                    [The Company said it] plans to take a larger
                      than expected charge of between $85 million
28                    and $95 million for the second quarter. . .

26

.The company previously said it would take a charge of between $15 million and $30 million associated with its accelerated transition from production of drives with thin film heads to desktop and enterprise hard drives featuring magneto-resistive [MR] head technology. In a press release Tuesday, the Company cited oversupply and 'higher than normal' competitive pricing pressure for its weaker outlook. Western Digital said it plans to exit the three-inch portable hard drive business and continue to cut production of desktop hardrives."

54. Another Dow Jones Release on December 2, 1997, stated that WDC said, "based on revised build plans, its production of hard drives with MR heads will exceed 75% of total drives shipped as it exits the June 1998 quarter."

55. In response to this dramatic and unexpected news, the price of WDC stock dropped on extremely heavy trading to $19.38, down more than $34 from its August 20 high of $54 and down $1.75 from the previous day's closing price. As reported on the December 3, 1997 Dow Jones News Wire, nearly 3.5 million shares of WDC stock were traded in the aftermath of defendants' announcement.

56. The following day, December 4, 1997, trading was even heavier as the market attempted to adjust to the bleak reality about WDC's operations. As reported on the December 4 Dow Jones News Wire: "A delayed reaction to Tuesday's news that [WDC] would quit some product lines and scale back on others likely accounted for the second drop in the Company's stock price this week . . . . [The stock] closed at 17 5/16 Thursday, down 1/4 or 6.5%. NYSE-listed volume was heavy, with 5 million shares changing hands."

57. In contrast to the individual defendants' efforts to mislead the investment community about the Company's business prospects and the value of its inventory, and to mask as long as possible the serious problems posed by its obsolete products and inventory, WDC's competitors timely and accurately disclosed the problems posed by their obsolete inventory and took the necessary charges against earnings, more than a year before the individual defendants did so. As reported in the December 3, 1997 edition of the Los Angeles Times:

> Western Digital, known for its ability to stretch the shelf life of older technology, has been slower than its rivals to adopt new standards, analysts said . . . "Western Digital is paying the price for that now," said Alexa McCloughan, an analyst with the research firm International Data Corp. "Their competition made similar moves a year ago and took their lumps back then." (Emphasis added.)

## VIOLATIONS OF GAAP

58. Throughout the class period, WDC's Forms 10-Q and 10-K and the financial statements contained therein were materially misleading because they failed to comply with generally accepted accounting principles ("GAAP"). GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which WDC is subject as a reporting company under the Exchange Act (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

59.  As alleged previously herein, because the Company was unable to sell its outdated hard drives, it accumulated significant excess, obsolete, or otherwise unsalable inventory. During the Class Period, defendants failed to properly write down this inventory through a charge to earnings as required by GAAP. As a result of this violation of GAAP, the Company's inventory, earnings and net worth were overstated during fiscal 1997 and the recognition of charges to earnings attributable to excess, obsolete, discontinued, or otherwise unsalable inventory was deliberately deferred by the individual defendants until the second fiscal quarter of 1998, when the truth could no longer be hidden.

60.  To conceal this fraud, defendants disseminated false and misleading statements regarding the reasons for the substantial declines in gross profit margins in fiscal 1997, as set out previously herein.

61.  SEC Rule 13a-13 requires issuers to file quarterly reports.  SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.  In addition, Item 303 of Regulation S-K requires a Management Discussion and Analysis ("MD&A") as part of periodic reports filed pursuant to Section 13(a).  Item 303 specifies that, for interim periods, the MD&A include, among other things, a discussion of any material changes in results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided. Instructions to Item 303 require that this discussion identify any significant

elements of income or loss from continuing operations that do not arise from or are not necessarily representative of ongoing business.  Defendants failed to comply with the foregoing provisions in that they knowingly failed to disclose the accounting impact of the competing newer hard drives on the Company's business, and the corresponding accounting impact of its obsolete hard drives, in all of the Forms 10-Q and 10-K throughout the Class Period.  Moreover, the individual defendants, in violation of GAAP, failed to disclose that:

> a.   projected earnings increases were being diminished as a result of the decreased sales of outdated hard drive disks;
>
> b.   the Company expected soft sales to continue into the second quarter of its fiscal 1998 year; and
>
> c.   because the Company was unable to sell its outdated hard drives, it accumulated a significant quantity of excess, obsolete, or otherwise unsalable inventory.

62.   APB Opinion No. 28 provides that:

> There is a presumption that users of summarized interim financial data will have read the latest published annual report, including the financial disclosures required by generally accepted accounting principles and management's commentary concerning the annual financial results, and that the summarized interim data will be viewed in that context.  In this connection, the management is encouraged to provide commentary relating to the effects of significant events upon the interim financial results.

63.   Throughout the Class Period, defendants failed to comply with APB Opinion No. 28 in that, as particularized herein, each of the Company's interim and year-end financial statements

30

failed "to provide commentary relating to the effects of significant events upon the interim financial results," including the "adverse impact of its obsolete inventory on the Company's present and forecasted future revenues."

64. The Company's fiscal year-end 1996 financial statements and all interim financial statements disseminated to the investing public during the Class Period were not presented in accordance with GAAP in that such financial statements failed to disclose that there existed a material overstatement of:

a.   the carrying value of inventory as assets on the Company's balance sheet; and

b.   income, assets, and net worth due to the failure to timely and fully reserve for excess and/or obsolete merchandise inventory.

65. GAAP (ARB 43 Chapter 4, Statement 3) provide that: "The primary basis of accounting for inventories is cost." GAAP also provides (ARB 43 Chapter 4, Statement 5) that:

A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as the cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market.

66. Defendants knew or were reckless in not knowing that as a consequence of the introduction of the new MR hard drives, its own hard drive inventory was overvalued or obsolete. The individual defendants, in contravention of GAAP, deferred the

31

1  recognition of a write-down of such inventory to market value

2  until fiscal 1998, when the truth could no longer be hidden.

3  67.  The financial statements of the Company are not

4  presented "fairly" in conformity with GAAP (AU Section 411)

5  because the financial statements, including the related notes,

6  are not informative of matters that affected their use,

7  understanding, and interpretation, and because the financial

8  statements do not reflect the underlying events and transactions

9  in a manner that present the financial position and the results

10  of operations within a range of acceptable limits that were

11  reasonable and practicable to attain in financial statements.

12  68.  The Company was required to disclose, in its

13  financial statements, the existence of the material facts

14  described herein and to appropriately and timely recognize and

15  report assets, revenues, and expenses in conformity with GAAP.

16  The Company failed to make such disclosures and to account for

17  and to report its financial statements in conformity with GAAP.

18  69.  Due to the Company's pervasive mosaic of material

19  omissions, materially misleading disclosures, deceptive

20  disclosures, and non-GAAP accounting, the Forms 10-K, 10-Q, (and

21  the financial statements contained therein) filed with the SEC

22  during the Class Period were materially false and misleading.

23  70.  Defendants knew, or were reckless in not knowing,

24  the facts which indicated that the fiscal 1997 and all of the

25  Company's interim financial statements, press releases, public

26  statements, and filings with the SEC which were disseminated to

27  the investing public during the Class Period, were materially

28  false and misleading for the reasons set forth herein.

71. The individual defendants have intentionally mischaracterized in press releases, public filings, and in discussions with analysts and other mass media, the nature and extent of the Company's decline in gross profit margins and other operating results.

72. Through the various misrepresentations enumerated herein, the individual defendants mischaracterized the decline in sales revenue and profit margins in fiscal 1997 as being due to temporary "price wars" and competitors dumping of "excess inventory" into the "distribution channels," when all along the individual defendants knew, or were reckless in not knowing, that they would have to write off enormous amounts of obsolete inventory, which they ultimately did in fiscal year 1988 after it became impossible to continue to hide the truth.

73. Defendants engaged in a fraudulent scheme or practice operating as fraud to artificially inflate the price of WDC stock by touting the Company's stock buyback program and substantial purchase of shares, even as the individual defendants and other Company insiders were disposing of their own holdings of WDC stock.

74. Had the true financial position and results of operations of the Company's operations been disclosed through the Class Period, its common stock would have traded at prices well below that which it did. As a result of the individual defendants' materially misleading public statements that accompanied reports of disappointing earnings before the truth was revealed, the price of WDC stock dropped substantially less than it would have but for the misrepresentations, thereby

33

1    continuing to be artificially inflated owing to the fraud.

2                          **SCIENTER ALLEGATIONS**

3               75.  As alleged herein, defendants acted with scienter

4    in that defendants knew that the public documents and statements

5    issued or disseminated in the name of the Company were materially

6    false and misleading; knew that such statements or documents

7    would be issued or disseminated to the investing public; and

8    knowingly and substantially participated or acquiesced in the

9    issuance or dissemination of such statements or documents as

10   primary violations of the Federal securities laws.  As set forth

11   elsewhere herein in detail, defendants, by virtue of their

12   receipt of information reflecting the true facts regarding WDC,

13   their control over, and/or receipt and/or modification of WDC's

14   allegedly materially misleading misstatements and/or their

15   associations with the Company which made them privy to

16   confidential proprietary information concerning WDC, participated

17   in the fraudulent scheme alleged herein.  With respect to non-

18   forward-looking statements and/or omissions, defendants knew

19   and/or recklessly disregarded the falsity and misleading nature

20   of the information which they caused to be disseminated to the

21   investing public.

22               76.  The individual defendants engaged in such a scheme

23   to inflate the price of WDC securities in order to:  (i) protect

24   and enhance their executive positions and the substantial

25   compensation and prestige they obtained thereby; and (ii) enhance

26   the value of their personal WDC securities, allowing for

27   profitable insider sales yielding proceeds in excess of $6.4

28   million, generating huge insider trading profits during the Class

                                     34

1  Period.

2          77.   In addition, the individual defendants' insider

3  selling is highly probative of defendants' scienter and is part

4  of defendants' scheme, artifice to defraud or acts, practices or

5  course of business in violation of Section 10(b) and Rule 10b-5.

6  As set forth above, while defendants were issuing false favorable

7  statements about the Company's business and concealing or

8  obscuring negative information, each of the individual

9  defendants, who had access to confidential information and were

10 aware of the truth about the Company and its products, was

11 benefitting from the illegal course of business or course of

12 conduct described in this complaint by selling large blocks of

13 the Company's stock at artificially inflated prices without

14 disclosing the material adverse facts about the Company to which

15 he was privy.  Such sales were unusual in their amount and in

16 their timing.  The numerous and repeated insider sales of WDC

17 stock by all of the individual defendants imposed upon them

18 duties of full disclosure of all of the material facts alleged in

19 this complaint.

20         78.  The following table reveals the massive insider

21 selling of the Individual Defendants during the Class Period:

23                   **Table of Insider Selling**

| Insider | Date | Number of Shares* | Price per Share** | Proceeds |
|---------|------|-------------------|-------------------|----------|
| C. Haggerty | 5/30/97 | 71,530 | 27.0625 | N/A*** |

| J. Abrahamson | 1/23/97 | 6,000 | 35.57 | $213,420 |
|---|---|---|---|---|
| | 6/16/97 | 3,000 | 30.38 | 91,140 |
| | 8/11/97 | 2,000 | 49.25 | 98,500 |
| | 8/19/97 | 1,900 | 51.31 | 97,489 |
| | 8/19/97 | 100 | 51.38 | 5,138 |
| I. Federman | 5/16/97 | 2,000 | 33.19 | 66,380 |
| | 8/11/97 | 2,500 | 49.63 | 124,075 |
| | 8/11/97 | 2,000 | 49.25 | 98,500 |
| | 8/22/97 | 4,500 | 51.00 | 229,500 |
| A. Krueger | 1/22/97 | 14,000 | 34.82 | 487,480 |
| | 1/22/97 | 4,000 | 34.88 | 139,520 |
| T. Pardun | 8/07/97 | 7,500 | 46.75 | 350,625 |
| | 8/08/97 | 5,000 | 48.06 | 240,300 |
| K. Braun | 1/16/97 | 8,310 | 35.07 | 291,432 |
| | 1/16/97 | 10,876 | 35.07 | 381,421 |
| | 1/16/97 | 914 | 35.07 | 32,054 |
| | 1/16/97 | 10,000 | 35.00 | 350,000 |
| | 1/16/97 | 750 | 35.00 | 26,250 |
| M. Nussbaum | 1/15/97 | 14,000 | 36.94 | 517,160 |

36

| | | | | |
|---|---|---|---|---|
| D. Schafer | 1/23/97 | 20,992 | 35.50 | 745,216 |
| | 1/23/97 | 38,108 | 35.50 | 1,352,834 |
| D. Williams | 2/20/97 | 874 | 38.32 | 33,492 |
| | 2/20/97 | 2,188 | 38.32 | 83,844 |
| | 2/20/97 | 938 | 38.32 | 35,944 |
| | 2/21/97 | 9,000 | 36.19 | 325,710 |
| M. Cornelius | 8/06/97 | 3,500 | 45.88 | 160,580 |
| | 8/04/97 | 2,816 | 40.13 | 113,006 |
| | 8/04/97 | 4,062 | 40.00 | 162,480 |
| | 7/16/97 | 3,471 | 41.00 | 142,311 |
| | 2/20/97 | 3,000 | 37.94 | 113,820 |
| | 2/19/97 | 1,716 | 38.44 | 65,963 |
| | 2/19/97 | 2,332 | 38.44 | 89,642 |
| S. Slavin | 7/24/97 | 3,502 | 38.56 | 135,038 |
| | 7/21/97 | 800 | 38.94 | 31,152 |
| | 7/18/97 | 3,562 | 38.88 | 138,491 |
| | 1/30/97 | 4,200 | 35.94 | 150,948 |
| A. Horn | 1/15/97 | 14,000 | 36.94 | 513,660 |
| S. Hughes | 1/15/97 | 10,000 | 37.32 | 373,150 |

| | 1/15/97 | 10,562 | 37.44 | 395,441 |
|---|---|---|---|---|
| M. Booth | 12/31/96 | 4,200 | | N/A*** |
| **TOTALS:** | | 314,703 | | $9,003,106 |

*Share numbers adjusted for 2 for 1 stock split on May 2, 1997
**Share prices adjusted for stock split
***Designated as a "gift"

79. As the Table of Insider Selling reveals, the first wave of insider selling occurred in January of 1997, within days of defendants publicly touting WDC's sequential earnings growth, "increased market share," and the "finest performance in company history" (the December 28, 1996 Form 10Q), and contemporaneously with defendants' January 13, 1997 announcement of record earnings owing to the "inherent advantages" of the Company's business plan and the Company's intention to repurchase three-quarters of a million shares of WDC stock. As reported by CDA - Investment Insiders' Chronicle on March 10, 1997, "In January, seven [WDC] insiders exercised and disposed of 81,656 shares at prices between $69.63 and $74.88 each. Though some of the selling insiders held on to small amounts of the shares exercised for, their trades cleared out the majority of their exercisable options . . . Selling executives . . . dropped between 29% and 54% of their stakes."

80. The second wave of insider selling occurred in August 1997, just two weeks after defendants reported record earnings for fiscal fourth quarter 1997 (the August 10, 1997 misleading statements), bragged that the Company had achieved 15

38

1  consecutive quarters of profitability, and predicted "continued
2  strength and market share" in the desktop drive industry.  This
3  second wave of insider selling also coincided with defendants'
4  fourth quarter announcement (on July 16, 1997) of WDC's
5  repurchase of an additional 1.2 million shares under the
6  Company's buyback program for a total of 22.2 million shares
7  repurchased, and also coincided with defendant Haggerty's August
8  10, 1997 public chiding of short sellers of WDC stock who,
9  according to Haggerty, would be "squeeze[ed]" and "lose money" as
10  WDC "continue[s] its steady advancement" and the price of WDC
11  stock "goes up."

12

13  **FIRST CLAIM**

14  **(Violation Of Section 10(b) Of The Exchange Act**
   **(Against All Defendants)**
15

16  81.  Plaintiff repeats and realleges each and every
17  allegation contained above, as if set forth herein.

18  82.  Defendants, individually and in concert, directly
19  and indirectly, by the use of means or instrumentalities of
20  interstate commerce and/or of the mails, engaged and participated
21  in a continuous course of conduct that operated as a fraud and
22  deceit upon plaintiff and the other members of the Class; made
23  various untrue and/or misleading statements of material facts and
24  omitted to state material facts necessary in order to make the
25  statements made, in light of the circumstances under which they
26  were made, not misleading; and employed devices, and artifices to
27  defraud in connection with the purchase and sale of securities.

28  83.  During the Class Period, defendants, with

39

1  knowledge of or reckless disregard for the truth, disseminated or
2  approved the false statements specified above, which were
3  misleading in that they contained misstatements and failed to
4  disclose material facts necessary in order to make the statements
5  made, in light of the circumstances under which they were made,
6  not misleading.

7        84. At all relevant times, the material misstatements
8  and omissions particularized herein directly or proximately
9  caused the damages sustained by plaintiff and the other members
10 of the Class.

11       85. Information showing that defendants acted
12 knowingly or with reckless disregard of the truth is peculiarly
13 within defendants' knowledge and control. As directors and
14 senior corporate officers of WDC, the individual defendants had
15 knowledge of the details of the Company's business and prospects.
16 Plaintiff purchased shares of WDC common stock on the open market
17 and does not have knowledge of the details of WDC's internal
18 corporate affairs.

19       86. As a result of the dissemination of the materially
20 false and misleading information and failure to disclose material
21 facts, as set forth above, the market price of the Company's
22 common stock was artificially inflated during the Class Period.
23 In ignorance of the materially false and misleading nature of the
24 reports and statements described above, plaintiffs and the other
25 members of the Class relied to their damage on the statements
26 described above and/or on the integrity of the market price of
27 the Company's common stock as reflecting the completeness and
28 accuracy of the information disseminated by the Company in

1 connection with their purchases of the Company's securities.

2 87. At the time of such misstatements and omissions,
3 plaintiff and the other members of the Class were ignorant of
4 their falsity, and believed them to be true. Plaintiff and the
5 other members of the Class could not, in the exercise of
6 reasonable diligence, have known the actual facts. Had plaintiff
7 and the other members of the Class known the truth, they would
8 not have taken such action.

9 88. The market for WDC common stock was open, well-
10 developed and efficient at all relevant times. As a result of
11 these materially false and misleading statements and failures to
12 disclose the full truth about WDC and its financial condition,
13 performance, and business, WDC common stock traded at
14 artificially inflated prices during the Class Period, until the
15 time the adverse information referred to above was finally
16 provided to and digested by the securities markets. Plaintiff
17 and other members of the Class purchased or otherwise acquired
18 WDC securities relying upon the integrity of the market price of
19 WDC stock and market information relating to WDC, or in the
20 alternative, upon defendants' false and misleading statements,
21 and in ignorance of the adverse, undisclosed information known to
22 defendants, and have been damaged thereby. Those who sold their
23 shares during the Class Period were not able to fully recoup
24 their costs and suffered out-of-pocket losses and damages.

25
26
27
28

41

## SECOND CLAIM

### (Pursuant to Section 20(a) Of The
### Exchange Act Against The Individual Defendants)

89.   Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

90.   This claim is brought against the individual defendants with respect to the entire Class Period.

91.   The individual defendants acted as controlling persons of WDC within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's financial condition, operations, production cycles, and products, the individual defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the contend and dissemination of the various statements which plaintiff contends are false and misleading.  The individual defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

92.   In particular, the individual defendants had direct and supervisory involvement in the day-to-day operations of the Company and therefore, are presumed to have had the power to control or influence the particular transactions giving rise

42

to the securities violations as alleged herein, and exercised the same.

93. As set forth above in the First Claim, WDC violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, the individual defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

a. determining that this action is a proper class action, and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and lead plaintiffs pursuant to Section 21D(a)(3)(B) of the Exchange Act and his counsel as class counsel;

b. awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

43

1               d.     such other and further relief as may be just

2    and proper.

3

4    DATED:     Los Angeles, California
               December 12, 1997

5

6

7                                      By: _____
                                           LIONEL Z. GLANCY, ESQ.

8                                          LAW OFFICES OF
                                           LIONEL Z. GLANCY
9                                          1801 Avenue of the Stars
                                           Suite 308
10                                         Los Angeles, California  90067
                                           Phone: (310) 201-9150
11
     Of Counsel:
12

13   WECHSLER HARWOOD
      HALEBIAN & FEFFER LLP
14   488 Madison Avenue
     New York, New York 10022
15   (212) 935-7400

16

17

18

19

20

21

22

23

24

25

26

27

28

                              44

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:      Los Angeles, California
            December 12, 1997


By: _____
    LIONEL Z. GLANCY, ESQ.

    LAW OFFICES OF
    LIONEL Z. GLANCY
    1801 Avenue of the Stars
    Suite 308
    Los Angeles, California  90067
    Phone: (310) 201-9150

Of Counsel:

WECHSLER HARWOOD
  HALEBIAN & FEFFER LLP
488 Madison Avenue
New York, New York 10022
(212) 935-7400

## WESTERN DIGITAL CORPORATION
## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, ARTHUR L. PLEVY ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in the securities that are the subject of this action during the Class Period are as follows:

| Security | Transaction* | Date |
|---|---|---|
| Common Stock | 2000 Shares Purchased at $ 34.075 per Share | January 24, 1997 |
| Common Stock | 3200 Shares Purchased at $ 34.150 per Share | January 27, 1997 |
| Common Stock | 3000 Shares Purchased at $ 35.00 per Share | March 3,  1997 |
| Common Stock | 2000 Shares Sold at $ 36.25 per Share | October 17, 1997 |

*Prices and shares adjusted for May 2, 1997 2 for 1 stock split.

5.   During the three years prior to the date of this Certificate, Plaintiff has sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws:

NONE

6.   Plaintiff has sought to serve or served as a representative party for a class in the following actions filed subsequent to December 22, 1995:

NONE

7.   The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __11__ day of December 1997 at

Edison, N.J. .

(City)          (State)
Edison      New Jersey

_____
(Name)

Arthur L. Plevy

2